## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MISTA TURNER-BURGESS, Individually          )
  and in her capacity as mother and next friend   )
  of H.M.T., a minor child,                   )
                                                 )
        Plaintiff,                          )
                                                   )
vs.                                         )          NO. CIV-07-269-D
                                                   )
THE CITY OF OKLAHOMA CITY,  et al.,         )
                                                   )
        Defendants.                         )

## O R D E R

       Before the Court is the motion for summary judgment [Doc. No. 107] of Defendant Carol

Houseman ("Houseman").  Plaintiff timely responded to the motion, and Houseman has filed a

reply.

Background:

       Plaintiff Mista Turner-Burgess ("Ms. Turner-Burgess") brings this action  pursuant to 42

U. S. C. § 1983,[1] alleging her constitutional rights and those of her minor daughter, H.M.T., were

violated when H.M.T. was placed into protective custody during the investigation of an allegation

that H.M.T.'s father, John William Turner ("Turner"), had sexually molested her.  Ms. Turner-

Burgess  asserts a Fourth Amendment claim on behalf of H.M.T., alleging H.M.T. was unlawfully

seized when she was taken into protective custody.  She also alleges that her Fourteenth Amendment

rights of due process and familial association were violated when her daughter was placed in

protective custody without prior notice; a claim based on deprivation of familial association rights

is also asserted on behalf of H.M.T.

---

[1]Ms. Turner-Burgess also asserts a claim pursuant to the Oklahoma Governmental Tort Claims Act, but that claim is not directed at Houseman; accordingly, it is not addressed in this Order.

Ms. Turner-Burgess sues Houseman, an Oklahoma Department of Human Services ("DHS") social worker, in her individual capacity. Individual capacity claims are also asserted against Oklahoma City police officer Michael E. Klika ("Klika") and five John Doe defendants who are alleged to be Oklahoma City police officers.[2]

Houseman seeks summary judgment on the claims asserted against her, arguing the undisputed material facts entitle her to judgment because she did not participate in a violation of the constitutional rights of Ms. Turner-Burgess or H.M.T. She argues that, at a minimum, she is entitled to qualified immunity from § 1983 liability on all claims. In response, Ms. Turner-Burgess contends disputed material facts preclude summary judgment.

Summary judgment standard:

Summary judgment shall be granted where the undisputed material facts establish that one party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

To avoid summary judgment, a plaintiff must present more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict for the non-moving party." *Id.* The factual evidence in the record and reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007); *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). However, a plaintiff's evidence must be sufficient to establish more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith*

---

[2]Ms. Turner-Burgess also initially sued the DHS; however, it was dismissed from the action by Order of April 24, 2007 [Doc. No. 32].

*Radio Corp.*, 475 U.S. 574, 586 (1986).  A plaintiff cannot rely on the allegations in his complaint, his personal beliefs, or conclusory assertions; rather, he must come forward with evidence outside the pleadings sufficient to create a factual dispute with regard to the issue on which judgment is sought.  Fed.R.Civ.P. 56(c); *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003)"); *Adler,* 144 F.3d at 671-72. It is not the responsibility of the trial court to attempt to locate evidence not cited by the plaintiff which could support her position. *Adler*, 144 F.3d at 671.

Where the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action.  *Celotex,* 477 U.S. at 322.  The movant is not required to disprove the cause of action, but need only point to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  The burden then shifts to the nonmovant to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citations omitted).  The facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied,* 506 U.S. 1013 (1992)). It is not the responsibility of the trial court to attempt to locate evidence not cited by a plaintiff which could support her position. *Adler*, 144 F. 3d at 671.

"The purpose of a summary judgment motion is to assess whether a trial is necessary." *Berry v. T-Mobile USA, Inc.,* 490 F. 3d 1211, 1216 (10th Cir. 2007) (citing *White v. York Int'l Corp*., 45 F.3d 357, 360 (10th Cir.1995)). "In other words, there 'must be evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486,

3

1490 (10th Cir.1995)).

Because Houseman argues she is entitled to qualified immunity from § 1983 liability, the Court must also apply the specific analysis applicable to summary judgment motions asserting qualified immunity. *Toevs v. Reid,* 646 F. 3d 752, 755 (10th Cir. 2011). "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a 'heavy two-part burden.'" *Lobozzo v. Colorado Dept. of Corrections,* 2011 WL 2663548, at *2 (10th Cir. July 8, 2011) (unpublished opinion) (quoting *Case v. West Las Vegas Indep. Sch. Dist.,* 473 F. 3d 1323, 1327 (10th Cir. 2007)). "[T]o avoid judgment for the defendant based on qualified immunity, 'the plaintiff must show that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.'" *Toevs,* 646 F. 3d at 755 (quoting *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006)). "We may address these questions in whatever order is appropriate under the circumstances." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). "If the plaintiff fails to satisfy either part of the two-part inquiry, we must grant the defendant qualified immunity." *Lobozzo,* 2011 WL 2663548, at *2.

The record before the Court:

In responding to Houseman's statement of undisputed facts, Ms. Turner-Burgess admits or denies "as immaterial" Nos. 1, 3, 4, 10 and 11. Response Brief at p. 1. Pursuant to the Local Civil Rules of this Court, the party opposing summary judgment must include a statement identifying the

material facts which he contends are disputed, and he must include references to record which he contends demonstrate a dispute:

> The brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts to which the party asserts issues of fact exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed. All material facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.

LCvR 56.1(c). "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it." *Grynberg v. Total, S. A.,* 538 F. 3d 1336, 1345 (10th Cir. 2008) (citing Fed.R.Civ.P. 56(e) and *Trevizo v. Adams*, 455 F.3d 1155, 1159-60 (10th Cir.2006)).

When challenging the movant's assertion that a fact is undisputed, the responding party has the burden "to ensure that the factual dispute is portrayed with particularity, without...depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F. 3d 1283, 1290 (10th Cir. 2004) (quotations omitted); *Mitchell v. City of Moore*, 218 F. 3d 1190, 1199 (10th Cir. 2000) (court is "not obligated to comb the record" to determine the basis for a claim that a factual dispute exists). If a nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be deemed admitted for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

In this case, Ms. Turner-Burgess fails to explain the basis for denying "as immaterial" any of the facts set forth in Houseman's fact statement Nos. 1, 3, 4, 10 and 11. Accordingly, those facts are admitted for purposes of this motion. These, and additional facts discussed *infra,* are established by the summary judgment record. The Court will consider the evidence as it appears in the record

rather than the parties' respective interpretations of that evidence.

The evidence before the Court establishes that the DHS received from the Oklahoma City police an initial referral or report of alleged sexual abuse of H.M.T. by Turner on April 19, 2005. A copy of the resulting "Report to District Attorney" regarding the referral is submitted under seal as Houseman Ex. 1.  At the time the report was referred to DHS, Houseman held the position of Child Welfare Specialist III, and she had been employed as a DHS social worker for more than ten years.  The referral was assigned to Houseman.

The sexual molestation allegation was reported to Klika during his investigation of a March 12, 2005 domestic violence complaint reported by Toni Cooper, Turner's girlfriend and the mother of his infant son, T.M.T.  Ms. Cooper also had a three-year-old son, T.K.C.  During her relationship with Turner, Ms. Cooper and T.K.C. lived with Turner, and H.M.T. often spent the night at his residence while they resided there. The evidence regarding the domestic violence investigation is set out in the Court's order addressing Klika's separate motion for summary judgment, and that discussion is adopted as though fully set forth herein.  The parties agree that, at the conclusion of this investigation, Turner was charged with domestic abuse in the presence of a child and with interfering with an emergency telephone call; he pled guilty to those charges.

It is not disputed that, during Klika's  investigation of the domestic violence complaint, Ms. Cooper reported to him her concern that Turner had sexually molested T.K.C. and H.M.T.  On April 7, 2005,  Ms. Cooper told Klika that T.K.C. told her Turner put his finger in T.K.C.'s bottom and that he did the same to H.M.T.  The specific comments of Ms. Cooper's son, T.K.C., are provided

in Klika Exs. 10 and 11.[3]  T.K.C. was examined by his pediatrician, who reported T.K.C. had an anal fissure, but it could not be determined if it was caused by sexual molestation.  Klika Ex. 12.  The pediatrician also reported T.K.C. told her Turner had touched his bottom and that Turner was "digging" in H.M.T's bottom.  *Id.*

After receipt of the molestation allegation, the decision was made to include in the investigation two officers assigned to the police department's Child Abuse Unit.  Inspectors Priscilla Helm and Teresa Sterling of that unit were assigned to work with Klika.  Klika dep., Ex. 6, pp. 58-60; 74-77.  The record reflects that, at the time, Priscilla Helm had been an Oklahoma City police officer for 15 years, had been assigned to the Child Abuse Unit for 10 years, had over 500 hours of training in child abuse investigation, and had investigated numerous child abuse cases.  Helm affidavit for search warrant, Klika Ex. 7, p. 2.   In addition to being assigned to the Child Abuse Unit, Inspector Sterling has testified as an expert witness in child abuse cases and has been lead investigator in thousands of child abuse investigations.  She has taught courses on the subject, and is a qualified forensic interviewer in child abuse cases.  Sterling dep., Klika Ex. 14, pp. 19-21; 26-29.  As police officers assigned to the Child Abuse Unit, Inspectors Helm and Sterling were part of a multi-disciplinary team having almost daily interaction with DHS.  Helm dep., Klika Ex. 13, p. 12.

On April 20, 2005, Houseman was contacted by Inspector Sterling involving the investigation.  The record reflects that, prior to April 20, Houseman was not aware of the evidence obtained in the police department investigation, and she did not know that Turner was the alleged

---

[3]Although Houseman and Ms. Turner-Burgess do not include these specific documents in their respective exhibits, the documents are part of the record before the Court and may be considered in the summary judgment arguments in accordance with Fed.R.Civ.P. 56(c)(3).

perpetrator; she learned his identity while reviewing the reports provided to her by Inspector Sterling.[4]  Houseman dep., Houseman Ex. 2, p. 10, lines 7-25; p. 11, lines 1-10.

As part of the investigation of potential child abuse, Inspector Sterling and Houseman went to H.M.T.'s school on April 20. Inspector Sterling interviewed H.M.T. in Houseman's presence and then, accompanied by Houseman, took H.M.T. to the Child Abuse and Evaluation ("CARE") Center to be interviewed by forensic interviewer Vicki Gauldin.  It is not disputed that the CARE Center is a nationally accredited child advocacy center which has participated since 1993 in an interagency, interdisciplinary approach to child abuse issues in Oklahoma County as part of the county's multidisciplinary child abuse team; the team was formed pursuant to an interagency agreement, a copy of which is submitted as Houseman Ex. 4.  The interagency team consists of several agencies, including but not limited to the Oklahoma County District Attorney's Office, DHS, and the Oklahoma City police department. *Id.*

It is not disputed that, during this time period, Ms. Turner-Burgess shared joint custody of H.M.T. with Turner.  Both Turner and Ms. Turner-Burgess are attorneys.  At the relevant time, Turner was employed by the State of Oklahoma as an Assistant Attorney General, and Ms. Turner-Burgess was employed by the Oklahoma County District Attorney.  Although the specific terms of

---

[4]Houseman also testified that, prior to April 20, the Oklahoma City police had advised DHS of an ongoing police investigation of child molestation that would likely be the subject of a formal referral. According to Houseman, Klika attended a regularly scheduled DHS meeting and advised that, during a domestic violence investigation, he received an allegation of possible molestation; he also advised that Child Abuse Unit inspectors Sterling and Patricia Helm were involved in investigating the complaint. Houseman dep., Ex.2, pp. 11-13; p. 15, lines 7-22. Houseman recalled no names were provided, but she understood a high-profile individual was possibly involved. Id., p. 15, lines 9-22. She also said the Care Center sometimes receives such notifications involving individuals who, because of their employment or position, would be described as high-profile. Houseman did not recall the exact date of this meeting, and said it could have been one to three weeks prior to April 20. However, she also testified that DHS was not authorized to begin its own investigation because it must receive a referral in order to do so.  A referral may consist of a direct complaint to DHS or a formal request by police officers who have received a complaint and initiated an investigation. Houseman dep., p. 18, lines 14-25; p. 19, lines 1-25; p. 20, lines 1-6.

their custody agreement are not in the record before the Court, the evidence reflects that H.M.T. spent several nights with Turner at his residence during the week as well as some weekends.

Ms. Turner-Burgess and Turner both testified that, upon receiving the sexual molestation allegation, the police and DHS had a duty to investigate the charge. Turner-Burgess dep., Klika Ex. 4, p. 152; Turner dep., Klika Ex. 1, pp. 148, 163. There is no dispute that Ms. Turner-Burgess was not notified in advance regarding Ms. Gauldin's interview of H.M.T., and she was not advised of the allegations concerning Turner until April 20.

Prior to H.M.T.'s April 20 interview, both Klika and Inspector Helm had interviewed Ms. Cooper and Turner's former girlfriend, Dawn Miller, regarding the child molestation allegations. The resulting statements are summarized in Inspector Helm's affidavit for a search warrant which was issued for the April 20 search of Turner's residence; the affidavit also summarizes the witness statements obtained by Klika during his investigation of the domestic violence complaint. *See* Helm affidavit in support of search warrant, Klika Ex. 7, pp. 6-9; 10-14. Prior to H.M.T.'s interview, forensic interviewer Gauldin had also interviewed T.K.C. at the CARE Center. His April 18, 2005 interview, which was also videotaped, is summarized in Gauldin's report, submitted as Klika Ex. 15. During the interview, T.K.C. told Ms. Gauldin that Turner put "red juice" and cream on T.K.C.'s bottom and that it hurt when Turner touched that part of his body. Ex. 15, p. 2; Ex. 7, pp. 15-16. Houseman was not present during this interview.

Following the forensic interview of T.K.C., Klika attended a meeting with Inspector Helm. Their supervisors, Lt. Eddie Blosser and Lt. Darla Dugan, also attended along with other police officers. The purpose of the meeting was to discuss the next actions to take in the investigation. Klika dep., Ex. 6, pp. 100-101; Helm dep., Klika Ex. 13, pp. 21-24. It was determined that Inspector

Helm would prepare an affidavit for a warrant to search Turner's residence and, if a warrant issued, she would supervise the search. Klika was assigned to interview Ms. Turner-Burgess. It was also determined that Inspector Sterling would contact DHS, and then arrange for H.M.T. to be interviewed at the CARE Center. Klika dep., Ex. 6, pp. 100-101; Helm dep., Klika Ex. 13, pp. 21-24. Both Klika and Helm recalled the decision was made that H.M.T. would be interviewed without prior notice to Ms. Turner-Burgess. Klika dep., Ex. 6, p. 189; Helm dep., Klika Ex. 13, pp. 76-77. Klika does not recall telling the group that he believed Ms. Turner-Burgess would warn Turner if she was notified of the allegation; however, he admitted he was concerned that, based on his interview with her in connection with the domestic abuse investigation, she seemed very protective of Turner and might try to inform him. Klika dep., Ex. 6, pp. 188-189.

It is not disputed that a warrant to search Turner's residence was issued and executed on April 20, 2005. The search, Klika's interview with Ms. Turner-Burgess, and the interview of H.M.T. all occurred during the same time period on April 20.

The report of Ms. Gauldin's April 20 interview with H.M.T. , which was also videotaped, is submitted as Klika Ex. 16. Ms. Gauldin did not review any police reports prior to interviewing H.M.T. Although Inspector Sterling and Houseman observed the interview, they did not participate. *Id.* During the interview, H.M.T. said that she lived with her mother part of the time and with Turner part of the time. She told Ms. Gauldin that, when she stays with Turner, she sleeps in his bed, but she has her own bedroom at his house. She said Turner regularly put cream on her bottom and "privates." She told Ms. Gauldin that the cream was medicine, and that her mother also put cream on her privates, but not on her bottom; only Turner did that. She said her mother and Turner use different creams, and she thinks Turner uses Vaseline. Other than the times he put medicine on

her, Turner did not touch her bottom or her privates.   H.M.T. drew pictures to show how Turner

applied the medicine, and told Ms. Gauldin he always did this while she was on his bed.  Klika Ex.

16.  Inspector Sterling reported the interview to her supervisor, Lt. Dugan, who made the decision

to place H.M.T. in protective custody.

The record reflects that, while the foregoing events were taking place, Klika met with Ms.

Turner-Burgess at the police station, where he  informed her of the sexual molestation allegation;

he also told her that Turner's residence was being searched, and  H.M.T. was being interviewed at

the CARE Center.  He advised her that a hearing would be conducted the following morning with

regard to the custody of H.M.T.  Klika dep., Ex. 6, pp. 219-220, 224; Turner-Burgess dep., Klika

Ex. 4, p. 54.  After the interview, Klika was convinced Ms. Turner-Burgess would protect H.M.T.

from future possible abuse and that H.M.T. should be released to her.  He talked with Houseman to

convey his opinion, but he learned that Lt. Dugan had already directed that H.M.T. be placed in

protective custody.  Klika dep., 6, pp. 116, 141-42.  It is not disputed that, although Klika verbally

informed Ms. Turner-Burgess of the time and location of the hearing to be conducted the following

day, he did not provide her with written notice of the hearing.

The record reflects that H.M.T. was placed in protective custody and spent the night of April

20 in the DHS Oklahoma County juvenile shelter. The parties agree that H.M.T. was returned to her

mother, Ms. Turner-Burgess on the following day, April 21, 2005, as directed by an Oklahoma

County Assistant District Attorney.  On Apri1 21, 2005, Turner and Ms. Turner-Burgess presented

to the Oklahoma County District Court an Emergency Temporary Order in which they agreed that

Ms. Turner-Burgess would have temporary sole custody of H.M.T. pending the DHS investigation

of the allegation against Turner.  The Order also directed Ms. Turner-Burgess to "keep the minor

child away from and out of complete contact with" Turner and to not restore his visitation rights

until the DHS investigation  concluded with a determination that "he is fit and capable of resuming

custody." A copy of the Order is submitted as Klika Ex. 18.[5]  Turner, who was represented by

counsel, expressly agreed to that temporary revision of the custody arrangement, although he denied

the allegation against him. *Id.*  It is not disputed that Houseman did not oppose this April 21, 2005

modification of the existing custody order, and she agreed that H.M.T. should be returned to Ms.

Turner-Burgess.

The evidence establishes that DHS continued its investigation of the molestation referral and

concluded that investigation on June 14, 2005.  Consistent with applicable procedures, DHS reported

its findings to the Oklahoma County District Attorney. The findings included a recommendation of

"Court Intervention Requested," thus recommending to the Oklahoma County District Attorney that

a deprived child action be filed. DHS Report to District Attorney, Houseman Ex. 1, p. 2. However,

no deprived child petition was filed because DHS's finding that its investigation confirmed the

allegation was reversed by the Appeals Section of DHS's Children and Family Services Division,

pursuant to administrative appeals filed by Turner and by Ms. Turner-Burgess.

The record further reflects that, upon Turner's motion, his visitation rights were further

modified by Court order of June 22, 2005, submitted as Klika Ex. 19. The Order expressly provides

that DHS expressed "no objection to supervised visitation" with H.M.T. as of that date, and agreed

that Turner should be allowed visitation to be supervised by Ms. Turner-Burgess.  The Order

provides details regarding the terms of the visitation, and it appoints a guardian ad litem for H.M.T.

Klika Ex. 19.

---

[5]Although Houseman and Plaintiff do not submit the April 21, 2005 Order in their exhibits, it is a part of the
record before the Court in this case.

On August 8, 2005, Turner's overnight visitation rights with H.M.T. were restored, with visitation to be supervised by a third party until further court order. August 8, 2005 Order, Klika Ex. 20. The August 8 Order also provided that Turner and Ms. Turner-Burgess would agree to select the party to supervise the visitation. The Order directed DHS to "release all further decisions affecting the minor child's custody to the parties and this Court," and determined DHS need not be notified of further proceedings in the matter. *Id.*

Application:

To prevail on a § 1983 claim, a plaintiff must prove: "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of [law]." *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir.2002) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (l980)). State actors "may only be held liable under § 1983 for their own acts." *Robbins v. Oklahoma*, 519 F. 3d 1242, 1247 (10th Cir. 2008). To impose § 1983 liability on a state actor, a plaintiff must show that such actor personally participated in the alleged violation of federal rights. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Personal participation for this purpose does not necessarily require that the defendant was physically present when the specific violation occurred because "direct participation is not necessary" to impose § 1983 liability. *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (emphasis in original). However, to prevail on a § 1983 claim, Plaintiff must prove a "causal connection" between the defendant's participation and the deprivation of his rights; to do so, she must establish an "affirmative link between the constitutional deprivation and the officer's exercise of control or direction." *Id.* (citing *Poolaw v. Marcantel*, 565 F. 3d 721, 732 (10th Cir. 2009)).

Fourteenth Amendment:

Ms. Turner-Burgess contends Houseman violated her due process rights because she did not notify her in advance of H.M.T.'s placement in protective custody on April 20, 2005.  She also asserts a substantive due process argument, contending Houseman violated her right to familial association by placing H.M.T. in custody; she also argues Houseman violated H.M.T.'s familial association rights by this action and by restricting her association with Turner.  In her summary judgment motion, Houseman argues that, as a matter of law, no constitutional violation occurred.  Houseman also argues she is entitled to qualified immunity on this claim because her conduct was consistent with governing law at the time.

Notice to the parent and a hearing are generally required before a child may be removed from parents.  However, an exception exists for extraordinary situations in which there is a valid governmental interest which justifies postponing the hearing until after the child is removed. *Roska v. Peterson*, 328 F. 3d 1230, 1245 (10th Cir. 2003). Where responsible officials have a "reasonable suspicion" of a threat to the child's safety, that is a sufficient governmental interest justifying removal of the child without prior notice and hearing. *Gomes v. Wood,* 451 F. 3d 1122,1130 (10th Cir. 2006), *cert. denied*, 549 U.S. 1053 (2006).  In *Gomes*, the Tenth Circuit rejected the contention that probable cause was required to justify removal of a child. Concluding that reasonable officials could differ in their opinion as to whether a reasonable suspicion justified removal, the Circuit concluded the defendant state caseworker who removed the child without prior notice and a hearing was entitled to qualified immunity from § 1983 liability.  *Gomes*, 451 F. 3d at 1131.

The Tenth Circuit has held that, where a child's parent is suspected of sexual abuse, the child

14

may be removed and placed in an overnight shelter without violating the parent's due process rights, so long as a post-deprivation hearing is promptly conducted. *J.B. v. Washington County*, 127 F. 3d 919, 927 (10th Cir. 1997).   In *J.B.*, the child was removed by social services workers after an allegation of parental sexual abuse; the parents alleged their due process rights were violated because they did not receive prior notice, and no hearing was conducted prior to the child's removal. Although the child was kept in overnight custody, a hearing was conducted the following day. The Tenth Circuit observed that, "in retrospect," the social services employees could have possibly taken steps to avoid keeping the child overnight, but the Circuit found no violation of parental rights on that basis. J.B., 127 F. 3d at 926. Instead, the Circuit found the procedure followed by the employees was reasonably calculated to balance the interests of the parents against the state's interest in protecting the child, given the circumstances faced by the employees at the time the decision was made; thus, no constitutional rights violation occurred. *Id.*

In this case, the undisputed facts establish that, at the direction of Lt. Dugan, H.M.T. was removed and kept in protective custody overnight. The following morning, in a court hearing, she was released to the custody of her mother, Ms. Turner-Burgess, with the Plaintiff's consent that the existing joint custody order be replaced by an order awarding Ms. Turner-Burgess sole custody and suspending Plaintiff's visitation privileges while the DHS investigation continued. Thus, a post-deprivation hearing was promptly conducted, consistent with the Tenth Circuit's decision in *J.B.*.

Even if the actions of Houseman were sufficient to constitute her participation in the decision to place H.M.T. in overnight custody without prior notice to Ms. Turner-Burgess, her actions were consistent with those approved by the Circuit in *J.B.*   Although Plaintiff was the custodial parent and was not accused of molestation, officials involved in the decision were required to balance her

15

familial interests against those of the state in protecting H.M.T. from perceived harm, according to the circumstances present at the time.  The record reflects that Houseman understood Helm and Klika had concerns that Ms. Turner-Burgess was overly protective of Turner.   There is nothing in the record to suggest that, at the time the decision was made, Houseman had reason to doubt the concerns of Helm and Klika.  Houseman testified that she was familiar with Helm, and knew that she was highly respected by the assistant District Attorneys who were responsible for child abuse cases. Houseman dep., Houseman Ex. 2, p. 52.  She believed Helm and Sterling were one of the best teams involved in child abuse investigations.  *Id.*

The record reflects, however, that Klika changed his opinion after interviewing Ms. Turner-Burgess on April 20, and he believed she would protect H.M.T. from potential abuse by Turner. Lt. Dugan had already made the decision to place H.M.T. in protective custody, but Klika told Helm and Houseman that he believed H.M.T. should be returned to her mother that night.  According to Houseman, Helm and Klika spoke very favorably about Ms. Turner-Burgess at that time, and they expressed their belief that she would protect H.M.T.  Houseman dep., Ex. 2, p. 60, lines 12-25; p. 61, lines 1-7.  However, Houseman testified  that, once she learned Helm and Klika agreed H.M.T. could be returned to Ms. Turner-Burgess that evening, it was too late to contact the assistant District Attorney to accomplish that result.  *Id.*, p. 61, lines 8-25.  According to Houseman, if she had received that information earlier, she would have tried to have H.M.T. released to Ms. Turner-Burgess without the need for overnight protective custody.  *Id.*

In her brief, Ms. Turner-Burgess argues at length that, contrary to this testimony, Houseman had adequate time to contact an assistant District Attorney and secure H.M.T.'s return to her that evening.  Assessing the facts with the benefit of hindsight, it is arguable that Houseman might have

16

exerted more effort to return H.M.T. to her mother without requiring overnight custody.   As the Tenth Circuit explained in *J.B.*, however, the propriety of her conduct must not be determined retrospectively – it must be viewed from Houseman's perspective based on the circumstances at the time.  *J. B.*, 127 F. 3d at 926.  The Court finds she acted reasonably in light of the circumstances.

Furthermore,  Houseman's conduct was consistent with the requirements of Oklahoma law at the time.  In 2005,  the applicable Oklahoma statute provided that, with respect to protective custody of a child, officers could remove the child and take her into custody without a prior court order "if continuation of the child in the child's home is contrary to the health, safety or welfare of the child." Okla. Stat. tit. 10 § 7003-2.1 (A)(l) (2005). The statutes were amended in 2009 and recodified at Title 10A § § 1-1-101, *et seq.*  As Inspector Helm testified, the statute currently provides there must be an "imminent" threat to the child's safety before she may be taken into protective custody. Okla. Stat. tit. 10A § 1-4-201 (A)(l).  However, the immediacy requirement was not the law in 2005. Accordingly, Lt. Dugan was not required to conclude that H.M.T. was in imminent danger prior to taking her into protective custody, and was required to find only that remaining in the home was contrary to her safety or welfare.  Ms. Turner-Burgess offers no authority suggesting that Houseman had a duty, or possessed the authority, to take action to attempt to alter Lt. Dugan's decision.   Furthermore, the record reflects that Houseman appeared in court the following morning with Ms. Turner-Burgess and that Houseman did not object to the modification of the custody order which allowed Ms. Turner-Burgess to have sole temporary custody of H.M.T.

The Court finds that the evidence in the record and the governing law establish that the placement of H.M.T. in protective custody on April 20 without prior notice to Ms. Turner-Burgess did not violate her due process rights under the circumstances. At a minimum, Houseman is entitled

17

to qualified immunity with respect to this claim because her actions were consistent with applicable law at the relevant time.

Ms. Turner-Burgess  also argues, however, that Houseman's conduct constituted an interference with her substantive due process right of familial association; she also asserts this claim on behalf of H.M.T.

The Fourteenth Amendment's due process clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Jensen v. Wagner*, 603 F. 3d 1182, 1197 (10th Cir. 2010); *Starkey v. Boulder County Social Services*, 569 F. 3d 1244 (10th Cir. 2009). The parental right is not, however, absolute.  States have a compelling interest in protecting the lives and health of resident children.  Accordingly, when a child's life or health is endangered by a parent's decision, the state may intervene without violating the parent's constitutional rights. *Jensen*, 603 F. 3d at 1197; *Starkey*, 569 F. 3d at 1253. The Tenth Circuit recognizes that "'the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved.'" *Starkey*, 569 F. 3 d at 1253 (quoting *Martinez v. Mafchir*, 35 F. 3d 1486, 1490 (10th Cir. 1994)).

The state's interest in protecting the life and health of resident children is well established, and justifies state intervention without violating the parent's constitutional rights.  *Jensen*, 603 F. 3d at 1197.  In such circumstances, the parent's right to familial association must be balanced against the state's interest in protecting children from abuse and neglect. *J.B.*, 127 F. 3d at 927.  In balancing these interests, "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." *Id.* at 925.  Governmental entities have a "traditional and transcendent interest" in protecting children

from abuse. *Maryland v. Craig*, 497 U.S. 836, 855 (1990). "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747,757 (1982).

Even if the conduct of an official interferes with the right of familial association, however, the official is not liable unless he acted willfully with the intent to interfere with the parental relationship. *J.B.*, 127 F. 3d at 927. "'Not every statement or act that *results* in an interference with the rights of intimate association is actionable.'" *Id.* (emphasis in original) (quoting *Griffin v. Strong*, 983 F. 2d 1544, 1548 (10th Cir. 1993)). "The conduct or statement must be directed 'at the intimate relationship with knowledge that the statement or conduct will adversely affect that relationship.'" *Id.* (quoting *Griffin*, 983 F.2d at 1548). Absent "evidence of wilfulness or intent," a cause of action cannot be maintained. *J.B.*, 127 F. 3d at 928.

In this case, Ms. Turner-Burgess argues that the evidence shows Houseman intentionally and willfully engaged in an investigation designed to show Turner was guilty of the molestation charge, without justification. She contends Houseman continually took action that restricted the rights of Turner and Ms. Turner-Burgess as well as those of H.M.T.

Having reviewed the record, the Court concludes that Ms. Turner-Burgess's  accusations regarding Houseman's motivations are not supported by the evidence. The record reflects Houseman performed her responsibilities as a DHS employee assigned to investigate a sexual molestation allegation.  The record does not evidence a wrongful motive on her part, nor does it support a conclusion that she intentionally sought to interfere with Ms. Turner-Burgess's parental rights or the rights of H.M.T. to associate with Ms. Turner-Burgess or with Turner.  The restrictions on Turner's visitation rights were imposed by the Oklahoma County District Court in

the April 21, 2005 court order.  Those restrictions were later modified in Turner's favor, and allowed

H.M.T. additional contact with him.  Order of June 22, 2005, Klika Ex. 19.   There is evidence in

the record that, while the June 22 order remained in effect, Turner and Ms. Turner-Burgess asked

Houseman if additional contact between H.M.T. and Turner could be authorized, and she told them

such contacts would violate the existing order and might endanger Ms. Turner-Burgess's custody

rights.   That Houseman did so does not evidence a wrongful motive on her part because the court

order in effect at the time placed restrictions on Turner's contact with H.M.T.   There is nothing in

the record to show that Houseman's response was incorrect or somehow motivated by a wrongful

intent; on the contrary, her response was consistent with the terms of the June 22 Order.

   Both Turner and Turner-Burgess were attorneys and were aware of the court procedures.

Certainly, they had the knowledge to seek the court's assistance if they desired further modification

of the existing order.   The suggestion that Houseman had the obligation to seek such authorization

and failed to do so because of a wrongful intent to harm any of the parties is not supported by the

evidence.

   Where a defendant asserts a qualified immunity claim, the plaintiff must do more than show

that the government actor intentionally or recklessly caused injury to the plaintiff. *Moore v. Guthrie*,

438 F. 3d 1036, 1040 (10th Cir. 2006).   In this case, even if  the evidence of record, construed most

liberally in Ms. Turner-Burgess's favor, could be seen as reflecting mistakes by Houseman, those

mistakes do not overcome her qualified immunity defense to the Fourteenth Amendment claim of

interference with familial rights. Under the law, she is entitled to qualified immunity if her actions

were objectively reasonable in light of the information she possessed at the time of those actions.

*Hollingsworth v. Hill*, 110 F. 3d 733, 738 (10th Cir. 1997).  The record before the Court reflects that,

in conducting this investigation, Houseman acted in accordance with her ten years of experience as a DHS social worker.  There is no evidence that she intentionally sought to wrongfully interfere with the familial rights of Ms. Turner-Burgess or H.M.T. beyond the interference that necessarily results from an investigation of child possible molestation.

The Court concludes that Ms. Turner-Burgess has failed to present evidence from which a reasonable jury could conclude that Houseman violated the Fourteenth Amendment right to familial association under the circumstances presented at the time.  Her actions were consistent with established law at the time, and she is entitled to qualified immunity from § 1983 liability.  Accordingly, her motion for summary judgment is granted.

Fourth Amendment:

Ms. Turner-Burgess also argues that Houseman's conduct in placing H.M.T. in protective custody violated H.M.T.'s Fourth Amendment right because it constituted an unlawful seizure without probable cause.  Houseman also seeks judgment on this claim.

The legal authorities discussing a child's Fourth Amendment rights in circumstances involving protective custody actions address these rights in conjunction with alleged interferences with familial association rights and the attendant due process rights.  The Circuit in *J.B.* discussed the issues of Fourth and Fourteenth Amendment rights in similar circumstances, and noted that the issues overlap in the context of the removal of a child from the custodial parent.  *J.B.,* 127 F. 3d at 928-29.  As discussed, *supra,* the Circuit emphasized the balancing of state interests against the personal interests protected by the Fourth and Fourteenth Amendments.  Moreover, the Circuit has rejected the contention that probable cause is required to support removal of a child in these circumstances.  *Gomes*, 451 F. 3d at 1131.  Instead, state officials must have a reasonable suspicion

that the child's safety or welfare are endangered by her continuing presence in the home; the state's interest in protecting the child is balanced against her liberty interests and the interests of the parents. *Id.*

Because the Court has already considered the balance of interest applicable to these facts, that discussion need not be repeated in the context of a Fourth Amendment claim. For the reasons previously stated, the Court finds no violation of H.M.T.'s Fourth Amendment rights based on her placement in protective custody on April 20, 2005.

In any event, as the Court has discussed, even if Houseman's involvement in the decision to place H.M.T. in protective custody is deemed sufficient to constitute participation for § 1983 purposes, the record establishes that her actions were consistent with the law applicable in 2005. Accordingly, she is entitled to qualified immunity from § 1983 liability on this claim.

Conclusion:

For the foregoing reasons, the motion for summary judgment of Carol Houseman [Doc. No. 107] is GRANTED as to all claims asserted by Ms. Turner-Burgess on her own behalf and on behalf of H.M.T.

IT IS SO ORDERED this 30th day of September, 2011.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

22